UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN R. CUNNINGHAM, | ) | Case No.  1:06CV1418 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | REPORT AND RECOMMENDATION |
| COMMISSIONER OF | ) | OF MAGISTRATE JUDGE |
| SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits (DIB).  ECF Dkt. #26.  Plaintiff contends that substantial evidence does not support the Administrative Law Judge's (ALJ) discounting of his credibility or his finding that Plaintiff could perform other jobs existing in significant numbers in the economy.  *Id.* at 6-26.  For the following reasons, the undersigned recommends that the Court affirm the ALJ's decision.

**I.**     **PROCEDURAL HISTORY**

Plaintiff had been granted DIB beginning April 2, 1993 due to end-stage renal disease, but his DIB ended in May of 1998.  Tr. at 85-86.  Plaintiff has since filed a number of applications for DIB, but he filed his most recent application on  June 26, 2001, alleging disability beginning May 1, 1998 due to status-post kidney transplant, diabetes, heart problems, fatigue, inability to carry weight, and unstable balance.  Tr. at 104-105, 125-127.  The Social Security Administration (SSA) denied the

1

application and affirmed the denial upon reconsideration.  *Id*. at 90, 104-111.  Plaintiff requested a hearing before an ALJ, and a hearing was held on August 24, 2004.  ECF Dkt. #24.  Plaintiff, his counsel and a vocational expert (VE) appeared at the hearing, but the ALJ continued the hearing because medical evidence from December 2001 and after was missing from the record.  *Id.* at 842.

On October 5, 2004, the ALJ held another hearing and Plaintiff testified with counsel present. ECF Dkt. #24 at 848.  At the hearing, the ALJ  noted that recent vocational records were missing and explained to Plaintiff's counsel that he wanted to see these records from 2000 and after because "they may have a significant bearing on the case."  *Id*. at 878.

On April 12, 2005, the ALJ held another hearing and Plaintiff testified with counsel present. Tr. at 51-79.  Plaintiff's counsel arrived twenty minutes late.  *Id.* at 53.  The recent Bureau of Vocational Rehabilitation (BVR) records and other medical records were added to the file and a VE testified.  *Id.*  At the end of the hearing, Plaintiff's counsel asked the ALJ, "Can I just submit a - something in writing, please?  I just - - I am having a real hard time functioning, right now."  *Id.* at 74.    On July 29, 2005, the ALJ denied Plaintiff's application for DIB, finding that while his impairments of diabetes mellitus with peripheral vascular disease and neuropathy, status post kidney transplant, and possible pancreatic transplant, were severe, they did not meet or equal, individually or in combination, the Listing of Impairments in 20 C.F.R. Part 4, Subpart P, Appendix 1.  Tr. at 31. The ALJ partially discounted Plaintiff's testimony of his symptoms and limitations and found that Plaintiff could frequently lift up to five pounds, occasionally lift up to ten pounds, sit for six hours during the course of an eight-hour day, and stand/walk for two hours of an eight-hour workday.  *Id*. He further found that Plaintiff could not work at or near unprotected heights, could only very occasionally climb ramps or stairs, had to avoid temperature and humidity extremes, could only occasionally stoop, and could never bend.  *Id.*  The ALJ also found that he had a minor loss of visual

acuity and partial loss of his right great finger and thumb, Plaintiff was also precluded from working with small parts and could not perform rapid, repetitive motions with his arms and hands.  *Id.*

Plaintiff requested that the Appeals Council review the ALJ's decision, and the Council denied Plaintiff's request, concluding that the evidence and additional arguments provided no basis to change the ALJ's decision.  Tr. at 9.  Plaintiff filed an appeal to this Court and Defendant answered.  ECF Dkt. #s 1, 8.  Both parties have filed briefs addressing the merits of the case.  ECF Dkt. #s 26, 30.  At issue is the ALJ's July 29, 2005 decision, which stands as the final decision.  Tr. at 23-32; 20 C.F.R. § 404.984.

## II.    SUMMARY OF MEDICAL EVIDENCE

Plaintiff was awarded DIB beginning April 2, 1993 for the severe impairment of end-stage renal disease.  Tr. at 86.  The medical records show that Plaintiff has been a diabetic since the age of eleven and underwent a kidney transplant in May 1995 for end-stage renal disease secondary to insulin dependent diabetes mellitus.  *Id.* at 295.  The doctor noted Plaintiff's surgical history as including a pericardial window in February 1994, and right arm fistula converted to a graft and a vitrectomy.  *Id.*    On August 30, 1995, Plaintiff underwent surgery on his left eye after he was diagnosed with a massive vitreous hemorrhage with severe proliferative diabetic retinopathy.  Tr. at 270.  He had undergone the same procedure to his right eye in February 1994 for the same diagnosis.  *Id.* at 277. On October 31, 1995, Plaintiff underwent an esophagogastroduodenoscopy due to persistent dyspepsia and regurgitation despite the use of an H2 blocker.  Tr. at 282.  He was diagnosed with presumed diabetic gastroparesis and mild distal esophagitis and he was prescribed medications.  *Id.*

In July 1998, Dr. Thomas Knauss, a nephrologist, indicated that Plaintiff had a good prognosis status post his renal transplant.  Tr. at 443.  He noted Plaintiff's diabetic nephropathy and functional limitations of some postural hypotension and difficulty with handling small objects.  *Id.*  He opined

that Plaintiff could maintain full-time employment. *Id*.

In September 1998, Vocational Guidance Services (VGS) provided a work evaluation for Plaintiff, indicating that his physical limitations resulting from kidney transplant, diabetes and hypertension included tiring easily and experiencing some dizziness which affected his balance at times. Tr. at 134. The report noted that Plaintiff had a driver's license and that he "just wants to work again." *Id***.** at 135. However, VGS could not provide further recommendations because Plaintiff did not complete the work evaluation. *Id.* It was noted that Plaintiff demonstrated the abilities to learn quickly, follow complex written and verbal instructions, retain instructions to task completion, attend to task and concentrate, and he had adequate physical stamina for sitting tasks. *Id*. at 137. Plaintiff also showed adequate quality-consciousness for a competitive work setting, the ability to accept supervision, and adequate punctuality for the competitive work setting. *Id.*

On October 14, 1998, Plaintiff was found passed out in his car at a work site and was brought to the emergency room. Tr. at 430. Plaintiff explained that he had not taken his insulin that morning and he did not eat. *Id.* He was diagnosed with diabetic reaction, treated and released. *Id.*

On September 9, 1999, Dr. Singerman indicated that Plaintiff's proliferative diabetic retinopathy remained stable in both eyes, but he showed clinically significant macular edema in the right eye. Tr. at 450. The left eye showed maculopathy with microaneurysms but without clinically significant edema. *Id*.

On September 21, 1999, Dr. Singerman completed an agency questionnaire indicating that he first examined Plaintiff on January 3, 1994 and last examined him on September 9, 1999. Tr. at 446. Dr. Singerman noted Plaintiff's visual acuity at last examination to be 20/100 in the left eye and 20/100-1 in the right. *Id.* at 445. He indicated that Plaintiff's corrected vision was 20/30 in the left eye and 20/50 in the right eye status post laser photocoagulations in both eyes. *Id.* He noted that

-4-

Plaintiff's vision was decreased in both eyes and Plaintiff had difficulty seeing both far and near. *Id*. He noted Plaintiff's two eye surgeries and opined that Plaintiff could lift and carry objects and travel with assistance. *Id*. at 446.

On October 1, 1999, Dr. Knauss completed an agency questionnaire indicating that he had first examined Plaintiff in May 1995 and had last examined him on August 5, 1999. Tr. at 320. He noted Plaintiff's renal transplant of 1995 and indicated that Plaintiff complained of dizziness since March 1997 and increased fatigue since December 1997. *Id*. at 317. He noted the nature of Plaintiff's renal problem as diabetic neuropathy with treatment of status post renal transplant in May 1995. *Id*. at 318. He indicated that Plaintiff had parestethesias and weakness since the transplant, but no osteodystrophy with bone pain or pruritis, and only one episode of pericarditis since 1994. *Id*. at 318. He described difficulties with keeping Plaintiff's diabetes under control, indicating that Plaintiff's glycohemoglobin levels were high and he had frequent hypoglycemia. *Id*. He described Plaintiff's gait as mildly wide-based and he diagnosed Plaintiff with diabetic nephropathy status post renal transplant, diabetic neuropathy, hypertension and diabetic gastroparesis. *Id*. at 320. He listed the nine medications that Plaintiff was taking and concluded that Plaintiff could sit, stand one hour at a time, walk three-quarters of an hour at a time, and carry and lift up to twenty-five pounds intermittently. He indicated that Plaintiff had limited balance, moderate fine motor impairment, mildly impaired sustained concentration and persistence and he sometimes became frustrated in adapting to his impairments. *Id*.

On October 4, 1999, Dr. Knauss wrote a letter indicating that Plaintiff had done very well with his kidney transplant with no rejection episodes and he required only one antihypertensive medication. Tr. at 322. Despite his well-functioning transplant, Plaintiff complained of feeling weak, having poor balance, and becoming fatigued quickly. *Id*. Dr. Knauss believed that Plaintiff's symptoms were not related to his renal status, but were more likely related to his diabetes mellitus with attendance

-5-

vasculopathy and neuropathy.  *Id.*

On October 22, 1999, Dr. Krause examined Plaintiff at the request of the agency.  Tr. at 452. He diagnosed Plaintiff with insulin dependent diabetes with retinopathy and nephropathy, history of renal failure secondary to insulin dependent diabetes, status post renal transplant without history of rejection, and hypertension.  *Id.* at 453.  Dr. Krause offered no recommendations as to Plaintiff's abilities, just noting that Plaintiff was on disability that had terminated and he was now active with the BVR for vocational retraining.  *Id.*

On March 7, 2000, Dr. Knauss completed another agency questionnaire indicating that he had last examined Plaintiff on February 10, 2000.  Tr. at 316.  He diagnosed Plaintiff with diabetic nephropathy, status post kidney transplant, diabetic neuropathy and hypertension.  *Id.* at 315.  He concluded that Plaintiff could: sit; stand for one hour; walk for one-half to three-fourths of an hour; lift less than twenty-five pounds intermittently; and he had limited balance, a moderate fine motor impairment, mildly impaired sustained concentration, persistence and pace and frustration and impatience in trying to adapt in performing activities with his impairments.  *Id.*

On March 11, 2000, Plaintiff was treated at the hospital for low blood sugar.  Tr. at 425.

Plaintiff was hospitalized with right foot infection from November 9, 2000 to December 2, 2000.  Tr. at 402, 483-484.  On November 9, 2000, Plaintiff presented to the emergency room after trying to treat his foot after he stepped on a nail a couple of weeks prior while at work.  *Id.* at 407. X-rays showed a soft tissue infection with a gas-forming organism or gas-gangrene on right foot and a deformity of the second metatarsal with ossification.  *Id.*  On November 21, 2000, Plaintiff underwent an x-ray of his right foot which revealed an ulceration along the plantar aspect of the foot and a thick periosteal new bone formation along the distal aspect of the second metatarsal consistent

-6-

with chronic osteomyelitis.  *Id.* at 461.  Plaintiff underwent an incision and debridement of his foot and was treated with antibiotics.  *Id.* at 484.

On December 11, 2000, Dr. Niemczura, Plaintiff's foot surgeon, completed an agency questionnaire indicating that he first examined Plaintiff on November 9, 2000 and last examined him on November 25, 2000.  Tr. at 499-500.  Dr. Niemczura indicated that Plaintiff had an abscess of his forefoot secondary to diabetes mellitus and underwent a wide debridement which left a hole in his right foot.  *Id.* at 497.  Examinations revealed trophic changes in Plaintiff's right foot and the gangrene was limited to superficial tissue only.  *Id.* at 498.  He saw evidence of drainage, inflammatory changes, swelling or systemic changes, and he expected Plaintiff to be able to return to full weight-bearing in 2001.  *Id.*  He indicated that surgery had been performed for the diagnosis of gangrene of the right foot secondary to trophic ulcer with penetrating wound.  *Id.* at 499.  He listed Plaintiff's current therapies as using a whirlpool and taking oral medication.  *Id.*  He opined that Plaintiff had no limits on sitting, but he was limited in standing and walking on his right foot because he was on crutches, and he had limited bending, carrying and lifting of objects, and traveling.  *Id.*

On February 3, 2001, Dr. Knauss completed another agency questionnaire indicating that he last examined Plaintiff on November 1, 2000.  Tr. at 313.  He stated the nature of Plaintiff's renal problem as diabetic nephropathy and indicated that Plaintiff was status post renal transplant and had paresthesias and weakness since the transplant, but no osteodystrophy with bone pain or pruritis, and only one episode of pericarditis since 1994.  *Id.* at 311.  He diagnosed Plaintiff with end-stage renal disease secondary to diabetic nephropathy, now status post renal transplant with good billograft function, diabetic foot ulcer with cellulitis, gastroesophageal reflux disease, peripheral vascular disease, peripheral neuropathy, and hypertension.  *Id.* at 313.  Dr. Knaus listed nine different

medications as therapies. *Id.*  In assessing Plaintiff's ability to perform physical activities, Dr. Knauss concluded that Plaintiff could sit, stand for one hour, walk two blocks, bend, and intermittently lift up to twenty-five pounds.  *Id.*  Dr. Knauss also opined that Plaintiff could handle objects , although he had a fine motor impairment.  *Id.*  He also listed a limitation due to Plaintiff's healing foot ulcer. *Id.*

On February 16, 2001, Dr. Vendeland performed an ophthalmological consultative examination of Plaintiff, noting his history of diabetic retinopathy and multiple laser treatments in both eyes.  Tr. at 507.  He found abnormalities in Plaintiff's eyes and diagnosed proliferative diabetic retinopathy and incipient cataracts in both.  *Id.* at 508.  However, Dr. Vendeland concluded that Plaintiff could perform most work-related activities at the present time from "an eye standpoint."  *Id.*

On February 23, 2001, Dr. Berger examined Plaintiff at the request of the agency.  Tr. at 509. He noted Plaintiff's recent episodes of hypoglycemic reactions, including one that he had on the day of the examination.  *Id.*  He noted Plaintiff's numerous laser treatments for diabetic retinopathy and indicated that Plaintiff had occasional periods of lightheadedness with postural changes.  *Id.*  Plaintiff described his main weakness from the kidney transplant as marked muscle weakness and fatigue.  *Id.* Upon testing, Plaintiff's blood sugar was elevated.  *Id.* at 511.  Dr. Berger explained that Plaintiff had a typical history of chronic diabetes with end organ damage to the kidneys.  *Id.*  He indicated that Plaintiff had a transplant and was taking suppressive medications which had the side effect of fatigue. *Id.*  He diagnosed diabetes mellitus, kidney transplant for renal failure, immunosuppressive medication and generalized muscular weakness.  *Id.*  He opined that "[o]n the basis of the objective examination, the marked increased fatigueability associated with his underlying problem is going to interfere with most forms of gainful employment."  *Id.*

-8-

Plaintiff had fifteen trips to the emergency room via ambulance from August 31, 2000 to September 6, 2001 after various family members found him either lethargic, confused and/or unresponsive.  Tr. at 331-336, 357-359, 369, 411, 417.  On most occasions in which he presented to the emergency room, Plaintiff refused treatment and sometimes even refused to be seen.  *Id.* at 331, 357, 359, 369, 372, 411, 417.  Hospital records noted that Plaintiff was frequently seen at the emergency room after having low blood sugar and that when he awakened in the hospital, he usually left without being seen.  *Id.* at 357.  On at least one occasion, Plaintiff pulled out his own IV and crumpled up and threw away his discharge instructions.  *Id.* at 336.

On March 27, 2001, an unidentified physician completed a physical RFC form after reviewing Plaintiff's medical records.  Tr. at 517.  He indicated Plaintiff's primary diagnoses as diabetes mellitus, nephrology and retinopathy and status post kidney transplant with other diagnoses of right foot infection and fatigue.  *Id.*  This doctor opined that Plaintiff could:  frequently lift up to ten pounds and occasionally lift up to twenty pounds; stand and/or walk up to two hours of an eight-hour workday; sit about six hours per workday; he had unlimited abilities to push and pull; and he could occasionally climb ramps and stairs, but not ladders, ropes or scaffolds.  *Id.* at 518-519.  The physician indicated that Plaintiff had no manipulative, visual or environmental limitations, except he had to avoid all exposure to hazards such as heights.  *Id.* at 419-421.

On June 5, 2001, Plaintiff was admitted to the hospital after he complained of diarrhea, weakness, palpitation and fatigue.  Tr. at 674.  He was diagnosed with hyperosmolar state, diabetes mellitus, diarrhea and dehydration and treated with insulin and other medications.  *Id.*  Plaintiff left the hospital the next day against medical advice.  His final diagnoses included status post hyper-smolar state, diabetes mellitus, hypertension, chronic renal failure and diabetic ulcer on the right foot.

-9-

*Id*. at 674-675.

On October 22, 2001, Dr. Sagone completed a physical RFC form for the agency after reviewing Plaintiff's medical records. Tr. at 532. He listed Plaintiff's primary diagnosis as status post kidney transplant in 1995 and offered a secondary diagnosis of diabetes and other diagnoses of diabetic retinopathy and fatigue associated with immunosuppressive drugs. *Id*. at 526. He opined that Plaintiff could lift ten pounds frequently and twenty pounds occasionally, he could sit, he could stand and/or walk up to six hours per workday and he had unlimited ability to push and pull. *Id.* Postural limitations included never climbing ladders, ropes or scaffolds and no manipulative or visual restrictions were identified. *Id*. at 527-528. The only environmental restriction was for Plaintiff to avoid even moderate exposure to hazards such as machinery and heights. *Id*. at 529. Dr. Raabe affirmed these findings on January 29, 2002. *Id*. at 532.

On November 3, 2001, Plaintiff presented to the emergency room via ambulance due to decreased mental status and low blood sugar. Tr. at 589. Upon arrival at the hospital, Plaintiff was oriented and stated, "get me my food—I will not stay long." *Id*. at 590.

On December 5, 2001, Dr. Kosoglov completed an agency questionnaire indicating that he first examined Plaintiff on December 28, 1993 and last examined him on December 5, 2001. Tr. at 538. He reported Plaintiff's difficulty achieving diabetic control on February 7, 2001 and July 18, 2001 and gave recent lab study results and blood pressure readings. *Id*. at 536-537. He listed diagnoses of diabetes, diabetic retinopathy, history of dialysis, status post kidney transplant for renal failure, and continuous immunosuppressive medication. *Id*. at 538. He did not complete the form requesting his opinion as to Plaintiff's limitations on physical and mental activities. *Id.*

-10-

On May 31, 2002, Lake Hospital Systems Rehabilitation and Wellness (LHSRW) issued a functional assessment indicating that Plaintiff could lift up to twenty-eight pounds above shoulder level, sit up to eight hours per day with no limitations and regular breaks, stand up to four hours but only in fifty minute increments with regular breaks, and walk moderately short distances for two to three hours.  Tr. at 816-817.  He could bend and stoop frequently, squat, climb stairs and crouch occasionally, and crawl and kneel continuously.  *Id.*  The assessment further stated that Plaintiff had poor balance. *Id.*

On August 25, 2002, Goodwill Industries (Goodwill) issued a final report of a work evaluation for Plaintiff based upon meetings with him and evaluations of his abilities.  Tr. at 734.  Patricia Borzaga, the job coach, indicated that Plaintiff had worked at a Goodwill store for four days and was pleasant and cooperative and motivated to do his best.  *Id.*  She found that Plaintiff was capable of completing an eight-hour workday without extra breaks or rest periods, he stayed on task, and he was a quick learner.  *Id.*  She did not find Plaintiff's stamina to be a factor.  *Id.*  Ms. Borzaga found Plaintiff capable of following multi-step directions, planning ahead, staying on task, making good decisions, and she found that he could sit and stand for up to two hours between breaks, he could lift up to twenty-five pounds, and he could bend, stoop and climb up two steps on a ladder.  *Id.*

Ms. Borzaga noted that Plaintiff had trouble carrying objects up and down stairs because of poor balance and said that he would have great difficulty working with small parts and small tools because of the partial amputation of a finger and thumb on his right hand.  Tr. at 734.  She concluded that Plaintiff could perform a "sitting down" light assembler/packager position that required no small parts or tools.  *Id.* at 735.  She found Plaintiff to be polite, hard working, prompt, eager to learn and help and motivated to return to the work force.  *Id.*

-11-

On November 27, 2002, Dr. Siegel evaluated Plaintiff for a sequential pancreas transplant. Tr. at 646. However, Plaintiff tested positive for cocaine and his creatinine levels were high, so Dr. Siegel ordered a social service evaluation for his drug usage and sought to resolve the creatinine problem. *Id*. at 647.

On January 6, 2003, Plaintiff presented to the emergency room complaining that he had been nauseated and vomiting for three days with some diarrhea. Tr. at 578. It was noted that Plaintiff was not compliant with his medications as his glucose levels were very high and his potassium levels were low. *Id*. at 572. Plaintiff refused to be transferred to another hospital and requested to sign out against medical advice. *Id.* at 573, 580.

On June 8, 2003, Plaintiff presented to the hospital complaining of left ankle pain after he tripped in a pothole. Tr. at 622. He was diagnosed with a left fractured calcaneus and cellulitis of the left ankle. *Id*. at 623. However, Plaintiff refused admission to the hospital and signed out against medical advice. *Id.*

On March 18, 2004, Dr. Knauss examined Plaintiff regarding his complaints of frequent and severe diarrhea. Tr. at 608. Dr. Knauss explained to Plaintiff that multiple causes of diarrhea exist in an immunosuppressed person and he noted that it was not strictly diarrhea but was an accentuated postprandial gastrocolic reflux. *Id*. Blood tests and a stool sample were taken and Dr. Knauss reduced one of Plaintiff's medications. *Id.* Blood tests revealed high alkaline phosphatase and AST on the hepatic function panel, and high glucose, urea nitrogen, creatinine and albumin and low sodium and chloride on Plaintiff's renal functional panel. *Id*. at 610-611. Plaintiff's cholesterol, VLDL, triglycerides and HGB A1C were also high on his lipid profile. *Id*. at 612. Plaintiff's complete blood count showed low red blood count, HGB and HCT. *Id*. at 613.

-12-

On July 21, 2004, Dr. Sunshine, a neurologist, examined Plaintiff at Dr. Kosoglov's request for his complaints of generalized weakness. Tr. at 544. Plaintiff complained that he wanted to get stronger, but he was unable to and he felt unsteady when he walked on uneven ground. *Id.* Upon examination, Dr. Sunshine stated that Plaintiff's dysequilibrium was based upon many factors, including diabetic neuropathy, a medication that he was taking, and his previous uremia. *Id.* at 545. He ordered an EMG with nerve conduction studies, blood tests and a CT of the brain. *Id.*

A hemoglobin test conducted on July 21, 2004 showed that Plaintiff's hemoglobin ALC was high. Tr. at 546. Plaintiff was advised by Dr. Sunshine to speak to his primary care physician. *Id.* at 547. A x-ray of Plaintiff's abdomen showed that his kidneys had numerous calcifications most likely due to his renal disease. *Id.* at 569.

An August 26, 2004 note from Dr. Hricik, a nephrologist, indicated that he examined Plaintiff for follow-up from Plaintiff's hospital stay in March because of severe diarrhea and dehydration. Tr. at 598. Dr. Hricik indicated that Plaintiff had intermittent diarrhea and had crackles in his left lung base. *Id.* Dr. Hricik made no changes to Plaintiff's immunosuppressive medications. *Id.* at 599.

September 9, 2004 EMG results showed a severe motor sensory peripheral polyneuropathy on the right with possible mild right C5 radiculopathy with no evidence of active denervation. Tr. at 824.

## III.   SUMMARY OF TESTIMONIAL EVIDENCE

Plaintiff first testified at the ALJ hearing held on October 5, 2004, with his counsel present. ECF Dkt. #24 at 848. Additional evidence was also presented into the record. *Id.* at 850. Plaintiff complained of fatigue, problems with his balance, difficulty with numbness and tingling in his hands, and reduced hand strength. *Id.* at 851.

Plaintiff stated that he completed schooling up through the eleventh grade and he had a year of construction training. ECF Dkt. #24 at 851. He stopped working construction in 1990/1991

because his kidneys were failing. *Id*. He had a kidney transplant five years later and is waiting to be put on a list for a pancreatic transplant as soon as other issues are resolved. *Id.* at 855. He said that Dr. Knauss told him that his transplanted kidney will last for twelve years before he has to undergo another transplant. *Id.* at 856. He stated that he had no problems resulting from the transplant. *Id*.

Plaintiff also discussed his diabetes, indicating that he did have problems with his insulin becoming too low and his glucose running high such that the paramedics would have to come to his house up to twice a month. ECF Dkt. #24 at 857. He explained that Dr. Kosoglov changed his insulin and he has been able to regulate these problems by catching his sugar before it gets too low. *Id*.

Plaintiff complained of problems with his strength, indicating that he could not build any muscle and he had recently undergone an EMG ordered by Dr. Sunshine. ECF Dkt. #24 at 859. He also explained that if he walked on a sidewalk or cement, his ankles rolled and he had no strength in his feet. *Id.* He complained of fatigue, explaining that if he walks far, he gets dizzy and he becomes unstable if it is really sunny outside. *Id*. He believed it was because of his eye surgeries. *Id.*

When the ALJ asked why Plaintiff could not perform a job where he sat for six hours and stood for two or where he could sit and stand at will, Plaintiff answered that Ohio Rehabilitation Services (ORS) told him that he could not sit or stand for more than a couple hours at a time and that agency did not recommend any full-time jobs. ECF Dkt. #24 at 861-862. Plaintiff stated that ORS "gave up" on him because during the four years that he spent with them, no one could find him a job that accommodated his limitations. *Id*. at 862-863.

The ALJ asked Plaintiff why *he* thought he could not work and Plaintiff responded that he did not have the stamina or the stability to do so all day. ECF Dkt. #24 at 865. He indicated that he loses his balance if he does a lot of walking, and his feet, legs and knees get numb if he sits for too long. *Id*. at 866. Plaintiff did state that he could lift twenty to twenty-five pounds, but he could only carry up to ten pounds. *Id*. at 868. He also indicated that he had trouble gripping small objects, like a

-14-

penny or his medication, if they fell on the floor.  *Id*. at 871.

Plaintiff also indicated that he was taking seven medications per day and he described his problems with diarrhea from the transplant medications.  ECF Dkt. #24 at 872.  He said that he had diarrhea "all the time" and sometimes he has diarrhea ten times in an hour.  *Id*.  He also indicated that he is always dehydrated because of the medications.  *Id.*

When asked about household activities, Plaintiff reported that he could cook, wash dishes, load a dishwasher, make a bed, write, run a vacuum cleaner, sweep a floor, read a book fairly well, and he could watch a movie and go to a restaurant.  ECF Dkt. #24 at 868-869.  Plaintiff reported that he does not drive and does not have a license.  *Id.*

The ALJ continued the hearing so that additional evidence could be obtained from the records Plaintiff discussed relating to ORS.  ECF Dkt. #24 at 877.  The ALJ indicated that he would call a supplemental hearing if necessary.  *Id*.

On April 12, 2005, the ALJ had a supplemental hearing.  Tr. at 51.  Plaintiff testified with counsel present, and VE Mark Anderson also testified.  *Id.*  The hearing was started twenty minutes late and was almost cancelled because Plaintiff's counsel arrived late.  *Id*. at 53-54.  The ALJ noted that the vocational records Plaintiff spoke about at the last hearing were from the BVR and they were obtained and placed into the record.  *Id*.

The ALJ allowed the VE to review the new records and then presented to him a hypothetical person with Plaintiff's background who could: lift up to ten pounds frequently and twenty-five pounds occasionally; sit for six hours of an eight-hour workday; walk for two hours of an eight-hour workday; occasionally stoop; very occasionally climb ramps and stairs; avoid unprotected heights, ropes, ladders and scaffolds; not work on uneven surfaces or work in temperature extremes; and who could work a job that had no balancing requirements, no working with small parts, and no close visual acuity.  Tr. at 59.  The ALJ asked if such a hypothetical person could perform Plaintiff's past relevant

work and Mr. Anderson responded that he could not.  *Id.*  Mr. Anderson testified that the hypothetical individual could perform other jobs existing in significant numbers in the national economy, including that of mailroom clerk, machine tender, document preparer and security camera monitor.  *Id.* at 60, 838.

The ALJ then changed the lifting and carrying restrictions of the hypothetical person presented, indicating that the new hypothetical person could frequently lift and carry up to five pounds and occasionally lift and carry up to ten pounds.  Tr. at 60.  Mr. Anderson responded that this would reduce the job base to sedentary level, which would include only the document preparer and security camera monitor jobs that he had previously identified.  *Id.* at 60, 67, 838.  When asked to determine the jobs available for both hypothetical individuals, Mr. Anderson noted that he had accounted for the minor loss of visual acuity restriction by excluding jobs that would require constant near-acuity over two-thirds of a day.  *Id.*

Mr. Anderson informed the ALJ that the jobs that he presented were consistent with the jobs listed in the Dictionary of Occupational Titles, but the number of jobs available were not in the DOT. Tr. at 63.  He indicated that he obtained the number of jobs available from the Occupational Employ-Survey, the Bureau of Labor Statistics and local labor market surveys.  *Id.*

When the ALJ asked if Mr. Anderson's jobs would change if he also required a sit/stand option, Mr. Anderson replied that they would not.  Tr. at 67.  He also indicated that none of the jobs required rapid, repetitive use of the hands or arms.  *Id.*  Mr. Anderson also stated that these jobs included the restrictions of occasional crouching, no balancing, no kneeling, no crawling, no stooping, and no exposure to fumes or dust.  *Id.* at 73.

When Plaintiff's counsel asked if a one-hour nap was also required for the hypothetical individual during the workday, Mr. Anderson responded that all of the jobs he listed contemplate that an individual in any given hour is going to be off task no more than five or seven minutes.  Tr. at 70-

71.  He therefore indicated that blood sugar problems and fatigue that took the hypothetical person

off of task more than five to seven minutes per hour would make that person unemployable. *Id*. at 71.

Near the end of the hearing, Plaintiff's counsel asked: "Can I just submit a - - something in

writing, please?  I just - - I am having a real hard time functioning, right now."  Tr. at 74.  The ALJ

gave Plaintiff's counsel five working days to submit something in writing. *Id.* at 75.  The record does

not show that Plaintiff's counsel submitted anything in writing to the ALJ.

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the following required sequential steps for evaluating

entitlement to disability insurance benefits:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§20 C.F.R. 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R. 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§20 C.F.R. 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden of going forward

with the evidence at the first four steps and the Commissioner has the burden at Step Five to show

that other jobs in the economy are available to the claimant, considering his age, education, past

work experience and residual functional capacity.  *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.      STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this Court is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *Id.*; *Walters,* 127 F.3d at 532.  Substantiality is based upon the record taken as a whole.  *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VI.     ANALYSIS

Plaintiff asserts that substantial evidence does not support the ALJ's finding that he is not disabled.  ECF Dkt. #26 at 5.  He first challenges the ALJ's decision to partially discount his credibility relating to the extent of the limitations caused by his impairments.  *Id.* at 23-25.  He then challenges the jobs identified by the VE upon which the ALJ relied in order to find that other work existed for him in significant numbers in the national economy.  *Id.* at 6-23.

### A.      CREDIBILITY

Plaintiff asserts that the ALJ erred in discounting his credibility when the ALJ failed to discuss

the factors of Social Security Ruling (SSR) 96-7p in his decision and specifically failed to mention Plaintiff's fatigue and the impact of Plaintiff's medications on his fatigue and loss of muscle strength. ECF Dkt. #26 at 25. For the following reasons, the undersigned recommends that the Court affirm the ALJ's decision.

This Court affords great deference to an ALJ's findings regarding a claimant's credibility since the ALJ observes a witness' demeanor and credibility and has the opportunity to do so. *Casey v. Health and Human Servs.,* 987 F.2d 1230, 1234 (6th Cir. 1993), quoting *Hardaway*, 823 F.2d at 928. It is not the province of this Court to "...try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Walters*, 127 F.3d at 528. Subjective complaints of pain can support a claim of disability. *Wyatt,* 974 F.2d 680, 686 (6th Cir. 1992). However, an ALJ is not required to accept a plaintiff's own testimony regarding his pain. *Gooch v. Sec'y of Health and Human Servs*., 833 F.2d 589, 592 (6th Cir. 1987).

The social security regulations establish a two-step process for evaluating pain. 20 C.F.R. § 416.929, SSR 96-7p. First, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Id.*; *Stanley v. Sec'y of Health and Human Services*, 39 F.3d 115, 117 (6th Cir. 1994); *Duncan v. Sec'y of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). In other words, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. *Id.* Secondly, the ALJ must then determine the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.*

When a disability determination cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in SSR 96-7p. The factors set forth in SSR 96-7p include consideration of: the claimant's daily activities; location, duration, frequency, and intensity of his pain; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication being taken; treatment, other than medication, the individual receives or has received; any measures used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

In this case, the ALJ found that the record established the existence of medically determinable impairments that could reasonably be expected to produce symptoms that Plaintiff alleged. Tr. at 28. However, the ALJ then indicated that he had considered Plaintiff's prior work record, the medical findings, and the factors listed in SSR 96-7p, and found that Plaintiff's statements about the limited activities that provoked extreme fatigueability and loss of muscle strength and balance were inconsistent with his daily activities. *Id*.

## 1.    FATIGUEABILITY

While the ALJ did not specifically enumerate and apply each of the factors in SSR 96-7p in his decision, the decision contains findings showing that he considered those factors and he considered the impact of fatigueability on Plaintiff's RFC. The ALJ found that while fatigueability was a significantly limiting factor for Plaintiff, the evidence did not show that Plaintiff was rendered incapable of performing sedentary work. *Id*. The ALJ acknowledged Dr. Berger's statement that Plaintiff's fatigueability would interfere with most forms of employment, but he noted that Dr. Berger did not conclude that Plaintiff was unemployable. *Id*. at 29. Further, VGS had concluded in September 1998 that Plaintiff had adequate physical stamina for sitting tasks. *Id.* at 137. Dr. Knauss

also indicated in October 1999 that while Plaintiff had paresthesias and weakness since his kidney transplant, he could sit, stand one hour at a time, walk three-quarters of an hour at a time and carry and lift up to twenty-five pounds intermittently. *Id.* at 320. Dr. Knauss also acknowledged that Plaintiff had limited balance, moderate fine motor impairment and mildly impaired sustained concentration and persistence. *Id*. Dr. Knauss further concluded on March 7, 2000, that despite Plaintiff's diagnoses of diabetic neuropathy, status post kidney transplant, diabetic nephropathy and hypertension, Plaintiff could sit, stand for one hour, walk for one-half to three-fourths of an hour, and carry up to twenty-five pounds intermittently, although he had limited balance, a moderate fine motor impairment and mildly impaired sustained concentration, persistence and pace. *Id.* at 315. Dr. Knauss also opined on February 3, 2001 that although Plaintiff had paresthesias and weakness since his kidney transplant and took nine different medications, Plaintiff could sit, stand for one hour, walk two blocks, bend, lift and carry objects up to twenty-five pounds intermittently, and he could handle objects, although he had a fine motor impairment. *Id*. at 311-313.

Moreover, two agency physicians found that Plaintiff could perform limited work despite his diagnoses which included fatigue. Tr. at 517. LHSRW had also concluded in May 2002 that while Plaintiff had poor balance, he could lift up twenty-eight pounds above shoulder level, stand up to four hours but in fifty-minute increments, walk moderately short distances, bend and stoop frequently, squat, climb chairs and crouch occasionally and crawl and kneel continuously. *Id.* at 816-817. Goodwill concluded in August 2002 that Plaintiff was a quick learner, his stamina was not a factor in his working, he stayed on task, made good decisions, he could sit and stand up to two hours between breaks, he could lift up to twenty-five pounds, and he could bend, stoop and climb up two steps on a ladder. *Id*. at 734. Ms. Borzaga of Goodwill noted that Plaintiff had trouble carrying objects up and down stairs because of his poor balance and she concluded that he would have trouble working with small parts and small tools because of his amputations. *Id*. However, she opined that

Plaintiff could perform a "sitting down" light assembler/packager position that required no small parts or tools. *Id.* at 735.

The ALJ also looked at Plaintiff's statements about his daily living activities which suggested that he was employable. Tr. at 29. Plaintiff testified that he could cook, wash dishes, load a dishwasher, make a bed, write, run a vacuum cleaner, sweep a floor, read a book fairly well, and he could watch a movie and go to a restaurant. ECF Dkt. #24 at 868-869. It is true that "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity". *Smith v. Califano*, 637 F.2d 968, 971 (3rd Cir. 1981). While daily activities are not determinative of disability per se, an ALJ can consider a plaintiff's statements of his activities in conjunction with other records in order to support a finding of nondisability.

With Plaintiff's statements, the medical records and the vocational records supporting his findings, the Court should find that the ALJ did consider Plaintiff's fatigueability and reasonably accommodated it by finding that Plaintiff could perform sedentary work with additional limitations on lifting and carrying, standing and walking, avoiding unprotected heights, very occasional climbing of ramps or stairs, occasional stooping and no bending. Tr. at 31. In fact, the ALJ specifically found that the sedentary level limit was "an acknowledgment of the significant limitation imposed by fatigueability." *Id.* at 29. Accordingly, the undersigned recommends that the Court find that substantial evidence supports the ALJ's determination regarding Plaintiff's fatigue.

### 2.    LOSS OF MUSCLE STRENGTH AND BALANCE

The undersigned recommends that the Court find the same with regard to Plaintiff's complaint that the ALJ did not consider the loss of muscle strength and balance problems caused by his medications. The ALJ indicated in his decision that Plaintiff alleged disabling limitations due to extreme fatigueability, weakness and loss of postural stability caused by diabetes and his kidney transplant. Tr. at 28. The ALJ then set forth the standard of reviewing Plaintiff's allegations of pain,

symptoms and restrictions resulting therefrom, citing both 20 C.F.R. § 404.1529 and SSR 96-7p.  *Id.*
The ALJ cited some of the medical evidence and then set forth a RFC for Plaintiff that accounted for
Plaintiff's weakness and postural instability, just as he did for Plaintiff's fatigueability.  *Id.*

The ALJ limited Plaintiff to work that did not involve unprotected heights and required only
occasional stooping, no bending, and very occasional climbing of ramps and stairs.  Tr. at 31.  He also
limited Plaintiff to lifting and carrying up to five pounds frequently and ten pounds occasionally,
sitting up to six hours and standing for two hours, and no work with small parts or rapid, repetitive
motions.  Tr. at 31.  These limitations are supported by the medical evidence, Plaintiff's statements
and the vocational records, and, in some respects, are more restrictive than the medical records even
contemplate.

It is true that Plaintiff complained throughout the years about generalized weakness and
balance problems.  However, Dr. Knauss diagnosed Plaintiff with diabetic nephropathy and other
functional limitations in July of 1998, but he opined that Plaintiff could maintain full-time employ-
ment.  Tr. at 443.  VGS provided a work evaluation for Plaintiff in September 1998 and acknowledged
physical limitations resulting from his impairments, including some dizziness which affected his
balance at times, but found that Plaintiff learned quickly, could attend to task and concentrate, had
adequate physical stamina for sitting tasks, and showed adequate quality-consciousness for a
competitive work setting.  *Id.* at 134-137.  In October 1999, Dr. Knauss noted Plaintiff's complaints
of dizziness and fatigue and indicated that he suffered paresthesias and weakness since his kidney
transplant, but the doctor nevertheless concluded that Plaintiff could sit, stand one hour at a time, walk
three-quarters of an hour at a time and he could lift and carry up to twenty-five pounds intermittently.
*Id.* at 318-320.  He did acknowledge Plaintiff's limited balance and moderate fine motor impairment.
*Id.*  Dr. Knauss again concluded in March 2000 that Plaintiff could sit, stand for one hour, walk for
one-half to three-fourths of an hour, lift and carry up to twenty-five pounds intermittently, although

he had limited balance, a moderate fine motor impairment and mildly impaired concentration, persistence and pace. *Id.* at 315. After noting Plaintiff's paresthesias and weakness, diagnosing Plaintiff with status post renal transplant, peripheral vascular disease, peripheral neuropathy, diabetic foot ulcer, reflux disease, and hypertension, and listing Plaintiff's nine medications, Dr. Knauss concluded in February 2001 that Plaintiff could sit, stand for one hour, walk two blocks, bend, lift and carry up to twenty-five pounds intermittently and he could handle objects although he had a fine motor impairment. *Id.* at 313.

Dr. Berger had examined Plaintiff at the request of the agency on February 23, 2001 and noted Plaintiff's diabetic retinopathy and his complaints of occasional lightheadedness and weakness and fatigue. Tr. at 509. He indicated that one of Plaintiff's medications caused fatigue and opined that Plaintiff's marked increased fatigueability would interfere with most forms of gainful employment. *Id.* at 511. However, as to muscle weakness or loss of strength, Dr. Berger reported that Plaintiff had no edema, swelling or tenderness in his extremities, no sensory abnormality or disturbance in gait, and full range of motion in the neck and shoulders. *Id.* at 510. He further found that squatting and rising were not impaired and there was no evidence of muscle spasm or atrophy. *Id.*

Moreover, two agency physicians reviewed the records and found that Plaintiff could frequently lift up to ten pounds and occasionally lift up to twenty pounds, stand and/or walk up to two hours a day, sit for six hour per workday, occasionally climb ramps and stairs, avoid all exposure to heights and not climb ladders, ropes or scaffolds. Tr. at 517-519, 532.

LHSRW issued a functional assessment on May 31, 2002 indicating that Plaintiff had poor balance, but he could lift up to twenty-eight pounds above shoulder level, sit up to eight hours per day, stand up to four hours per day but in fifty-minute increments, and walk moderately for short distances up to two to three hours. Tr. at 816-817. LHSRW also found that Plaintiff could bend and stoop frequently, squat, climb stairs and crouch occasionally, and crawl and kneel continuously. *Id.*

Goodwill issued its final report of its work evaluation for Plaintiff after he had worked in a Goodwill store for four days.  Tr. at 734.  Ms. Borzaga, the job coach, indicated that Plaintiff could complete an eight-hour day without extra breaks, he stayed on task and he learned quickly.  *Id.*  She found that Plaintiff's stamina was not a factor and he could sit and stand for up to two hours between breaks, he could lift up to twenty-five pounds and he could bend, stoop and climb up two steps on a ladder.  *Id*.  Ms. Borzaga did note that Plaintiff had difficulty carrying objects up and down stairs because of his poor balance and he would have great difficulty working with small parts and tools because of his partial amputations.  *Id*. at 735.  She opined that Plaintiff could perform a "sitting down" light assembler/packager position that required no small parts or tools.  *Id*.

Plaintiff also indicated that he could cook, wash dishes, load a dishwasher, make a bed, write, run a vacuum cleaner, sweep a floor, read a book fairly well, and he could watch a movie and go to a restaurant.  ECF Dkt. #24 at 868-869.

Based upon the medical records, the vocational evidence and Plaintiff's own statements, the undersigned recommends that the Court find that the ALJ adequately addressed Plaintiff's loss of muscle strength and balance difficulties in his decision.  The ALJ indicated in his decision that Plaintiff had an alleged disability due to weakness and loss of postural stability due to his diabetes and kidney transplant.  Tr. at 28.  He thereafter stated that he would evaluate Plaintiff's complaints of pain and limitations resulting from these particular symptoms under 20 C.F.R. § 404.1529 and SSR 96-7p.  *Id*.  He indicated that he had considered Plaintiff's prior work record, information and observations by examining and treating physicians and Plaintiff's own statements and the statements of third parties in rendering his decision.  *Id*.  He then set forth a RFC that was more restrictive than any of those provided by Plaintiff's treating physician, his vocational service providers, and most of the examining and reviewing physicians.  The ALJ limited Plaintiff to lifting and carrying up to five pounds frequently and ten pounds occasionally, not the twenty-five pounds suggested by Dr. Knauss,

Plaintiff's own treating physician.  The ALJ limited Plaintiff to sitting only six hours a day, when Dr. Krauss had indicated that Plaintiff could sit without limitation.  The ALJ also found that Plaintiff could stand and walk up to two hours per day, which is less than Dr. Knauss concluded.  And finally, the ALJ found that Plaintiff could not work on unprotective heights and could only very occasionally climb ramps or stairs and never bend, which addressed Dr. Knauss' finding that Plaintiff had limited balance.

Accordingly, the Court should find that substantial evidence supports the ALJ's decision to discount his credibility relating to the impact of his fatigueability and loss of muscle strength and balance on his ability to work.

### B.   STEP FIVE DETERMINATION

Plaintiff's primary argument is that the VE failed to explain how he determined the number of jobs existing at the national, regional and local levels that he could perform.  ECF Dkt. #26 at 11. Plaintiff asserts that the VE cited the sources from which he obtained his numbers, but "this testimony does not adequately explain where the VE obtained these numbers or how he may have 'extrapolated' these numbers." *Id.*  Plaintiff further complains that the numbers concerning the regional economy were not given by the VE either in his testimony or in his Summary of Jobs form.  *Id.*

Plaintiff provides his own calculations of percentages of the jobs available in order to show that the sedentary jobs of document preparer and security camera monitor are not significant.  Plaintiff uses the United States Bureau of Labor Statistics for 2003, the National Statistical Abstract, the Ohio State Occupational Employment and Wage Estimates for May 2003 and the County Business Patterns for 2003 for his calculations.  ECF Dkt. #26 at 12.  He takes each of these resources, plus the United States Census Bureau, and applies the VE's total numbers of jobs available at the national, state and local levels to the jobs that Plaintiff could perform to the total number of jobs at the national, state and local levels in 2003.  *Id.*  Plaintiff then calculates percentages for each of these levels for each job and

postulates based upon these percentages that a significant number of jobs does not exist in the economy for Plaintiff. *Id*.

The Court should reject these arguments. Mr. Anderson, the VE, did indeed state the sources from which he "extrapolated" the numbers of jobs existing in the economy. Mr. Anderson testified that while the hypothetical person could not perform Plaintiff's past relevant work, the individual could perform a significant number of other jobs which he referenced in his Summary of Jobs form. These jobs are identified as sedentary work as a document preparer, of which 250,000 jobs existed nationally, 25,000 jobs existed in the State, and 4,000 jobs existed locally, and security camera monitor, of which 125,000 jobs existed nationally, 5,000 jobs existed in the State and 1,200 jobs existed locally. Tr. at 60, 63, referring to Tr. at 838. The ALJ then asked Mr. Anderson:

> Q: All right. Now are the jobs you listed consistent with the DOT listing of jobs?
>
> A: Yes.
>
> Q: Now, the numbers don't occur in the DOT. Is that correct?
>
> A: No.
>
> Q: And therefore, how do you know about the numbers?
>
> A: Well, there are three different sources I use for that. One is the Occupational Employment Survey. That's the state jobs and family services. They put out a labor market information brochure. They're due out another one next month, but - - so those are the most current through 2004. I also get information from the Bureau of Labor Statistics and we also have information from local labor market surveys included.

Tr. at 63. Thus, the VE did state the sources that he used for the numbers that he presented. Further, the Court should find that the numbers reported by the VE are significant because the case cited by Plaintiff, *Hall v. Bowen*, 837 F.2d 272 (6th Cir. 1988), rejected the type of percentage analysis that Plaintiff has provided in this case and that case went on to find that 1,350 jobs existing in the local economy constituted a significant number of jobs for the claimant.

Plaintiff also cites 20 C.F.R. 404.1566(b) and asserts that the Commissioner failed to show that significant numbers existed in the region for Plaintiff and failed to obtain testimony from the VE about the isolated numbers of the jobs he identified.  ECF Dkt. #26 at 11-12.  20 C.F.R. § 1566(b) provides that "work which exists in the national economy means work which exists in significant numbers *either* in the region where such individual lives *or* in several regions of the country."  That section further provides that, "It does not matter whether ... [w]ork exists in the immediate area in which you live ...." and jobs "existing in the national economy" do not include "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [plaintiff] live[s] ...."

There is no indication in this case that the jobs existed in only very limited numbers in few locations outside of Plaintiff's region, considering that 250,000 sedentary jobs for document preparers existed nationally, 25,000 existed in the State and 4,000 existed locally.  *See* Tr. at 838.  The VE also noted that 125,000 jobs as security camera monitor existed nationally, 5,000 existed in the State and 1,200 existed locally.  *Id*.  The VE gave testimony about the national, state and local economies and Plaintiff's counsel did not request that the VE clarify the numbers of jobs that he provided or otherwise identify the regional economy even though she was given ample opportunity to do so.  The Court should therefore reject this assertion.

Plaintiff also contends that he could not perform the sedentary document preparer and security camera monitor jobs identified by the VE because his visual limitations and inability to grasp small objects and tools would rule out both of these jobs. ECF Dkt. #26 at 14-21.  Plaintiff first asserts that the security camera monitor job, described in the DOT as a surveillance system monitor, appears to describe only government service jobs.  *Id*.  Plaintiff speculates that he could not perform such a job because such a government job, in a post 9/11 world,  would fall under Homeland Security and likely require additional education and training and a security clearance which he would be unable to obtain

-28-

due to past legal problems.  *Id.*  The Court should reject this assertion because it is based upon pure speculation.  Moreover, 20 C.F.R. § 404.1566(a) provides that "[w]e consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country.  It does not matter whether ...(3) you would be hired if you applied for work."

Plaintiff further asserts that he could not perform the security camera monitor job because of his vision difficulties.  ECF Dkt. #26 at 15.  While the VE testified at the hearing that he excluded jobs that would require constant near acuity for over two-thirds of a day spent doing the job, Plaintiff contends that the camera monitor job would require constant near acuity.

The undersigned notes that Plaintiff's medical evidence relating to his diabetic retinopathy is somewhat dated.  In 1994 and 1995, Plaintiff underwent surgery on both of eyes due to massive vitreous hemorrhages with severe proliferative diabetic retinopathy.  Tr. at 270.  On September 9, 1999, Dr. Singerman indicated that Plaintiff's proliferative diabetic retinopathy remained stable in both eyes, but he showed clinically significant macular edema in the right eye.  *Id.* at 450.  The left eye showed maculopathy with microaneurysms but without clinically significant edema.  *Id.*  Dr. Singerman subsequently completed an agency questionnaire indicating that Plaintiff's visual acuity at last examination was 20/100 in the left eye and 20/100-1 in the right.  *Id.* at 445.  He indicated that Plaintiff's corrected vision was 20/30 in the left eye and 20/50 in the right status post laser photo-coagulations in both eyes.  *Id.*  He noted that Plaintiff's vision was decreased in both eyes and Plaintiff had difficulty seeing both far and near, but he still completed the physical and mental activities statement provided by the agency and found that Plaintiff could still perform most activities, although he needed assistance in traveling.  *Id.* at 446.

While doctors have noted Plaintiff's vision difficulties, the most recent medical opionions show that Plaintiff vision problems are less severe.  The most recent medical evidence is from Dr.

Vendeland, an agency consultative ophthalmologist, who in 2001, noted Plaintiff's history as including diabetic retinopathy and multiple laser treatments in both eyes.  Tr. at 507.  He found abnormalities in Plaintiff's eyes and diagnosed proliferative diabetic retinopathy and incipient cataracts in both eyes.  *Id*. at 508.  Nevertheless, Dr. Vendeland concluded that Plaintiff could perform most work-related activities at the present time from "an eye standpoint."  *Id.*  In 2002, it was noted that Plaintiff was eligible for vocational services because of his "significantly restricted visual fields."  Tr. at 722.  The Ohio Rehabilitation Services Commission form indicated that Plaintiff's visual fields were 15-20% in the right eye and 15% in the left eye.  *Id*. at 725.  However, there is no indication of the source of this information and Plaintiff does not present the source or sources to this Court.

It is true that Dr. Vendeland is not a treating physician, but a consultative physician who examined Plaintiff only once.  Tr. at 507-508.  However, the only records from Dr. Singerman, Plaintiff's ophthalmologist, are from 1999 and they indicated that Plaintiff's corrected vision was 20/50 in the right eye and 20/30 in the left, although he noted that Plaintiff's vision was decreased in both eyes and he had difficulty seeing both far and near.  *Id*. at 445.  And while Dr. Knauss indicated that Plaintiff's vision was stable in October 1999 but could worsen with time, in 2001, Dr. Berger, another consultative agency physician, found that Plaintiff's visual fields were normal and his visual acuity was 20/30 for near and far vision with no evidence of active hemorrhage at the time of the examination. *Id.* at 510.  In his July 21, 2004 letter to Dr. Kosoglov, Dr. Sunshine also informed Dr. Kosoglov that Plaintiff denied any visual loss.  *Id*. at 602.

The undersigned notes that this Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters,* 127 F.3d at 528.  The above medical evidence constitutes substantial evidence to support the ALJ's finding that Plaintiff suffered only a "minor loss of acuity".  While the more dated medical evidence suggests something more than a minor

loss of acuity, neither Dr. Singerman nor Dr. Knauss concluded that Plaintiff was precluded from working or that his vision loss was significant.  Coupled with Plaintiff's statement to Dr. Sunshine that he did not notice any visual loss, substantial evidence supports the ALJ's determination that any acuity loss was minor.

The ALJ thereafter presented a hypothetical person to the VE of a person with a "minor loss of acuity" and other restrictions and the VE listed two jobs that the hypothetical person could perform even when he excluded jobs that would involve constant near acuity for over two-thirds of a day.  The DOT for surveillance camera monitor, 379.607.010, indicates the following with regard to near acuity: "Near Acuity: Frequently - Exists from 1/3 to 2/3 of the time."  Further, the DOT supports the VE's testimony as it indicates that this job requires low color discrimination, no depth perception, no field of vision and no fingering, handling, or reaching.  Thus, the VE's exclusion was supported by the DOT and fits Plaintiff's fine manipulation restriction and his minor loss of visual acuity limitation as well.

Plaintiff also asserts that he cannot perform the other job of document preparer identified by the VE because he lacks computer training, he would be required to use small tools such as scissors, a razor knife and rubber stamps, and he would have to pick up individual pieces of paper, all of which require greater dexterity than he possesses because of the partial amputation of his great finger on the right hand and his left thumb.  ECF Dkt. #26 at 16.  Plaintiff also contends that this job would require rapid repetitive movements, although the VE indicated that it would not when asked by Plaintiff's counsel at the hearing before the ALJ.

The undersigned agrees with Plaintiff.  In the DOT, the job of document preparer, 249.587-018, indicates that the individual must use a paper cutter, copier, rubber stamp and a razor knife in order to perform the job.  It also indicates that handling is significant and reaching, handling and fingering of objects is performed frequently.  DOT 249.587-018.  However, the Court should find that

this error does not result in a finding of disability because, as explained above, Plaintiff could still perform the other job of security camera monitor as identified by the VE.  20 C.F.R. § 404.1566(b) provides in relevant part:

> How we determine the existence of work. Work exists in the national economy when there is a significant number of jobs (in **one** or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy". [emphasis added].

Thus, the one remaining job of security camera monitor still constitutes work that exists in significant numbers in the national economy for Plaintiff.  The Court should therefore find that while Plaintiff cannot perform the job of document preparer, substantial evidence supports the ALJ's decision to find that a significant number jobs existed in the economy based upon the VE's testimony that Plaintiff could perform the job of security camera monitor.

## VII.    CONCLUSION

Based upon a review of the record, the Statements of Error, and the law, the undersigned recommends that the Court affirm the ALJ's decision denying DIB to Plaintiff because substantial evidence supports his findings on Plaintiff's credibility and his ability to perform limited sedentary work existing in significant numbers in the economy.

Dated: February 25, 2008                              */s/George J. Limbert*
                                                      GEORGE J. LIMBERT
                                                      U.S. MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).